ESPASAS DAIRY, INC., COMPAÑÍA PASTEURIZADORA, INC., ETC., Petitioners; BUENA VISTA DAIRY, INC., ETC., Petitioners, *v.* MINIMUM WAGE BOARD OF PUERTO RICO, Respondent.

Nos. JSM-65-1, JSM-65-2.     Decided January 14, 1969.

*Enrique Córdova Díaz, Francisco Torres Aguiar, Sarah Torres Peralta,* and *Gustavo A. Del Toro Bermúdez* for petitioners. *Ismael Soldevila* and *Rafael Cabello Ortiz* for respondent.

ON MOTION FOR RECONSIDERATION

Mr. Justice Torres Rigual delivered the opinion of the Court.

This is a reconsideration of the judgment rendered by this Court, 94 P.R.R. 781 (decided June 20, 1967), on the validity of the provisions of Mandatory Decree No. 27 of the Dairy and Cattle Industry promulgated by the Minimum Wage Board on April 24, 1965, which refer to the fixing of the salaries of the driver-salesmen and the assistant-salesmen.[1]

■ On reconsideration petitioners have assigned ten errors which, for the sake of brevity and without sacrificing the truth, may be summarized into a single one: in having concluded that the Minimum Wage Board has the authority to fix the minimum wages per hour for the driver-salesmen and assistant-salesmen in the Dairy Industry, notwithstanding the provisions of Act No. 114 of June 30, 1965. 5 L.P.R.A. § 1120 (Supp. 1967, p. 113).

Since the beginning we accepted that the none-too-fortunate text of said law is susceptible to more than one interpretation. Our unavoidable duty is to enforce its provisions fully complying with the purposes of the lawmaker in passing it. This leads us to consider the nature of the problem involved and to determine the motives or reasons which served as basis for the approval of the act.

The dairy industry is of vital importance to our economy. The Government has promoted its development and growth by making abundant appropriations of public funds for the improvement of pastures, eradication of cattle diseases, artificial insemination, incentives for the construction of facilities in the cattle industry and others.[2] In the decade of 1954

---

[1] The facts which gave rise to this appeal appear in the opinion of June 20, 1967, therefore it is unnecessary to repeat them herein.

[2] Without considering the appropriations to other programs, up to 1963 over $6,000,000 had been paid to farmers as incentives for the

to 1964 the milk production increased to over $56,000,000, which was equivalent to twenty percent of the total value of the agricultural production of Puerto Rico.[3] The interpretation we give to Act No. 114 must not, in any way whatsoever, affect the stability of this important part of the economy, of whose welfare workers as well as employers participate.

It has been the practice of the dairy industry during the last years to compensate the driver-salesmen and their helpers on the basis of a commission for each quart of milk sold. Said practice has received the favorable approval of the employers as well as of the workers,[4] for a very cogent reason: the drivers as well as the employers thus have greater benefits. The payment on the basis of a commission stimulates the effort of the driver-salesmen to increase the sales, not only for their own benefit and that of their employers, but also for the economy in general.[5]

However, the committee which investigated the industry recommended the fixing of a minimum salary per unit or per hour, whichever is more profitable. The committee recommended the fixing of a compensation in that manner to protect the employers from claims for extra hours computed on the basis of double the commission received, which is the

---

improvement of pastures only. See the study prepared in December 1964 by the Economy Division of the Minimum Wage Board.

[3] Id.

[4] See the Statement of Motives of Act No. 114 of June 30, 1965, Laws of Puerto Rico, 1965, 1st regular session, p. 319.

[5] The conclusion that the workers receive a higher pay appears from the study of the Economy Division of the Minimum Wage Board itself. At page 38 of said study it is stated: "The largest number of employees (633) was registered in the driver-salesmen occupation. Said workers received an average wage per regular hour without including the incentive of 90.5 cents. This occupation resulted with the highest incentive payments. The incentive received by said workers raised the average wage per regular hour to 136.8 cents."

But not only do they receive more but also they work less. See Table 7 of the testimony of economist Luis A. Nazario: Exh. p. 5.

formula adopted by the Department of Labor. The formula consists in adding all the hours worked and dividing them by the total commission received in order to obtain the compensation per hour. Extra hours are then computed at double rate.[6] However, in view of the doubt of the efficacy of said remedy the committee recommended the Board to request the Legislature to legislate so as to exclude the driver-salesmen and their assistants from the Minimum Wage Act. Such action would settle "a state of uncertainty in the milk and cattle industries, in the light of possible future claims for extra hours worked, and threatens the stability of the industries. . . ," according to the Statement of Motives.[7] Such exclusion is fully sustained by incontrovertible facts which are accepted by the majority opinion itself. We copy from the Statement of Motives:

"These peddlers and their helpers perform their task without direct supervision, their employer being thus unable to regulate or ascertain the hours actually worked by them; they are the ones who sell the product, provide the service and attention, and act according to their own judgment to keep and increase their clientage, and they are the only ones who really know such clientage; they render their services outside of the milk plants; go back to the milk plants for the sole purposes of returning the property and settling the accounts of the milk and other dairy products sold, and they are, in fact, peddlers."

---

[6] See the testimony of Pedro Juan Dumont, Director of the Bureau of Labor Standards before the Committee. St. R., p. 107.

[7] See also, the Separate Opinion of the Chairman of the Committee, Carlos Rivera Hernández, which states:

"There is conflict of legal opinion as to whether, in case the payment on the basis of a commission is decreed now, the employers would always be exposed to future judicial claims for extra or extraordinary hours worked by driver-salesmen and assistant-salesmen."

.  .  .  .  .  .  .  .

"In other words, the representatives of the workers' interest claim that when they are compensated on the basis of a commission, the extra hours worked shall be paid on the basis of the commission received. This seems absurd. Although said payment plan is conceivable, the action of the committee in fixing salaries higher than $1.25 per hour would be evidently illegal."

The mere exclusion of these workers from the maximum labor periods established by Act No. 379 of 1948, without excluding them from the fixing of the minimum wage per hour, as interpreted in the opinion of the Court of June 20, 1967, does not solve the serious problem of uncertainty which threatens the growth and expansion of this industry.[8] In the first place, because although they are excluded from Act No. 379—if not under § 19 of Act No. 379, 29 L.P.R.A. § 288, *A. D. Miranda, Inc.* v. *Falcón,* 83 P.R.R. 708 (1961) —while compensation is fixed on the basis of minimum wage per hour, they would always be covered by § 16, Art. II of our Constitution,[9] which warrants the payment of extra compensation at the rate of, at least, one and a half times the regular wage for the overtime worked in excess of eight hours. The majority opinion itself has had to acknowledge it so. In the second place, because the fixing of wages per hour binds the employers to establish a—if not impossible, very costly—system of supervision and control which is incompatible with the fundamental purpose of Act No. 114 to promote the growth and expansion of said industry. As it is properly indicated in the dissenting opinion the position assumed by the majority *"frustrates with crystal clearness one of the announced legislative purposes in approving Act No. 114, to wit, that these employees would not be subject to the laws concerning maximum labor periods."*

---

[8] See the testimony of Rafael Nevárez Guillermety, St. R., p. 221.

[9] "The right of every employee . . . is recognized . . . to an ordinary workday which shall not exceed eight hours. An employee may work in excess of this daily limit only if he is paid extra compensation as provided by law, at a rate never less than one and one-half times the regular rate at which he is employed."

It should not be interpreted that said constitutional provision covers all the so-called "peddlers." We ratify the decision in *A. D. Miranda, Inc.* v. *Falcón, supra,* to the effect that the worker to whom the Constitution warrants the payment of extra hours of work is, *"the mass of the laboring class which, by reason of special abandonment, has historically been in need of . . . social protection."*

The commission system covers more than 90% of the workers in this industry. It was adopted more than a decade ago.[10] Its greatest virtue is that it eliminates the supervision difficulties inherent to the nature of the peddlers' work, without impairing their earnings. On the contrary, increasing them.[11]

Actually the system of minimum wages per *hour* is essentially incompatible with the nature of the work of these peddlers who ". . . perform their task without direct supervision, their employer being thus unable to regulate or ascertain the hours actually worked by them. . . ." It is precisely the lack of supervision and the difficulty in ascertaining the number of extra hours worked by these driver-salesmen what makes it necessary that they be excluded not only from the provisions of the law concerning the maximum labor periods, but also from the fixing of minimum wages per *hour*, since, in the final analysis, the *hour* is the unit of work which it would be necessary to supervise and check. To separate—as it was sought by the majority opinion—the maximum working day and the fixing of minimum wages, renders the legislative intent void and useless.

Summarizing, the interpretation adopted by the majority of the Court in the opinion of June 20, 1967, 94 P.R.R. 781, limiting Act No. 114 exclusively to exempting the driver-salesmen and their assistants in the Dairy and Cattle Industry from the maximum labor periods painfully defeats the intent to propitiate the growth and expansion of said industry, of whose welfare, we repeat, the workers as well as the employers participate.

■ Our judicial duty is to impart efficacy to the legislative intent always construing the law in such a way it may adequately respond to its purpose, and helping it to accomplish its purpose. Having stated the problem of this

[10] See the testimony of Dr. Isidoro Colón, St. R., p. 383.
[11] See footnote 5.

industry, as we have previously done, we must conclude that the purpose underlying Act No. 114 was not only to exclude the driver-salesmen from the provisions of Act No. 379 of 1948, *but also to limit the power of the Minimum Wage Board to fix compensation exclusively on the basis of minimum commissions.* In that way the public policy to dispel the state of uncertainty of this industry created by the application of the minimum wages and the provisions of the maximum labor period is accomplished.

The construction we give to Act No. 114 was the same given by the Chairman of the Minimum Wage Board when he objected before the Secretary of Labor—who also objected —to its approval.[12]

At that time, the Chairman of the Board understood the purpose of the legislation so clearly that, not agreeing with it, he opposed it. Now, acting over the Governor and the Legislature, to whom in our system of government corresponds the determination of the public policy, the law is disregarded and it is sought to render it ineffective. We do not agree.

■ The judgment rendered on June 20, 1967 will be set aside, and another rendered decreeing the nullity of Art. II of Mandatory Decree No. 27, subdivisions 2 and 3, insofar as they fix the minimum wage per hour for the driver-salesmen and assistant-salesmen.

Mr. Justice Santana Becerra dissented in a separate opinion in which Mr. Chief Justice Negrón Fernández, Mr. Justice Hernández Matos, and Mr. Justice Dávila concur.

---

[12] The Chairman of the Board, Carlos A. Vilá Tous, in his memorandum of May 25, 1965 to the Secretary of Labor presented his opposition to the project because:

"The project, in my opinion, would also render ineffective the minimum wage per hour in force in relation to said employees."

—O—

MR. JUSTICE SANTANA BECERRA, with whom MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ, MR. JUSTICE HERNÁNDEZ MATOS, and MR. JUSTICE DÁVILA concur, dissenting on reconsideration.

San Juan, Puerto Rico, January 14, 1969

On June 20, 1967, speaking for a majority of five justices of this Court, I rendered an opinion sustaining the validity of Mandatory Decree No. 27 applicable to the Dairy and Cattle Industry, Third Revision (1965).

On July 10 and 14, 1967 petitioner-enterprises filed motions for reconsideration. On July 21, 1967 the Minimum Wage Board opposed the reconsideration requested and moved for a hearing. On January 8, 1968 when the motion for reconsideration had not yet been decided, Mr. Justice Emilio S. Belaval, who took part in the majority opinion, retired. Now, with the intervention of Mr. Justice Torres Rigual, appointed to fill the vacancy, the case is decided on reconsideration, setting aside the original judgment of June 20, 1967 of the majority, and decreeing the nullity of subdivisions 2 and 3 of Mandatory Decree No. 27 concerning the fixing of minimum wage per hour worked by the driver-salesmen and the assistant-salesmen.

I believe the opinion on reconsideration is affected by the same error, which was brought down from the minority opinion in the original decision of the case, confusing and mystifying two entirely different concepts in the sphere of work, which are: (1) the concept of the minimum wage with (2) the concept of the minimum workday and working standards and conditions. In my opinion it is also affected by the error, like in the preceding minority opinion, of attributing to Act No. 114 of June 30, 1965 a purpose it did not have and the scope it does not have.

The legal authority of the Minimum Wage Board created by Act No. 96 of June 26, 1956, to fix a minimum wage alternatively, as it did in the Mandatory Decree challenged, for the driver-salesmen, is clearly sanctioned by § 16 of said Act, as amended by Act No. 105 of June 26, 1964. Said section expressly provides that under certain circumstances mentioned therein, "*as well as in any other economic activity*, the committees may recommend and the Board may fix minimum wages by units of work *instead of wage rates per hour, or alternatively*, whenever they may deem it advisable due to the nature of the work to be done." With this stipulation the lawmaker permitted the Committees and the Board to depart from the basic unit of minimum wage of the Act, which is *the hour*, and authorized them to use another unit, or *alternatively*.

It was thus deemed advisable by the Committee which adopted Mandatory Decree No. 27 and the Board which approved it, considering that the worker was more favorably protected by fixing the minimum wage rate in the alternative of the unit or the hour, in the light of certain typical peculiarities in the distribution of milk.

It is proper to bear clearly in mind, since Act No. 114 of 1965 is invoked to annul the Decree, that the Minimum Wage Board created by Act No. 96 of 1956 has nothing to do with *labor conditions and standards*. It exercises authority only and solely in the minimum wage rate. Any provision in connection with labor standards appearing in the mandatory decrees approved by the present Minimum Wage Board are additional statements, in force under the former legislation of 1941, which by express provision of § 40 (b) of the Act of 1956 should remain in force except what concerns minimum wage rates.[1]

---

[1] Hereafter see Act No. 116 of June 21, 1968: leave of absence and sick leave.

Mandatory Decree No. 27, which is challenged, was adopted by the Committee who investigated the Dairy and Cattle Industry on March 5, 1965. On April 2 and 5, 1965 petitioners challenged before the Board the approval of the draft of the Decree. Their original position was to the effect that the drivers who distributed the milk should not be considered as covered by Act No. 379 of 1948, under the provision of said law which excludes the salesmen from maximum wage rates and other standards. These objections—which did not refer to the minimum wage—did not prosper and on April 24, 1965 the Minimum Wage Board published the approval of Decree No. 27.

On May 3 and 4, 1965 petitioners requested the reconsideration of the approval of the Decree, as provided by law.—Section 29 (d), Act No. 96 of 1956. At this stage, the reconsideration being pending, petitioners notified the Board of the presentation, on March 10, 1965, of House Bill No. 135 which excluded the driver-salesmen and milkmen helpers in the Dairy Industry from the application of the laws and decrees concerning the *maximum working hours*. Bill No. 135 became Act No. 114 of June 30, 1965. Petitioners then requested the Board to remand the Decree to the Committee for action in the light of said legislation. The Board refused to do so and Mandatory Decree No. 27 was definitively approved. Petitioners challenged the Decree in the present appeals.

In the original opinion of the Court Act No. 114 is discussed. In view of the motives and scope which are attributed to said statute in the opinion on reconsideration, I deem it necessary to comment on the history of said Act.

(1) House Bill No. 135 was presented by Representative Milán Padró on March 10, 1965 and it was originally entitled: "To decree the nonapplicability of the laws and decrees on *maximum working hours* to milkmen and their helpers, in their peddling of fresh milk and other dairy products;

and to authorize the Milk Industry Committees to recommend and the Minimum Wage Board to approve minimum commissions for such employees." (Italics ours.) 19-2 Journal of Proceedings 398.

(2) As originally presented, the Bill consisted of a Statement of Motives and two sections. Section 1 provided that the laws and decrees establishing the *maximum working periods* for employees or regulating the *maximum working hours* of employees shall not be applicable to milkmen and their helpers, in their peddling of fresh milk and other dairy products. Section 2 provided that the minimum wage committees may recommend and the Minimum Wage Board may approve minimum commissions to be paid to peddlers of fresh milk and other dairy products, and to their helpers.

(3) As to the rationale of the Bill the Statement of Motives stated that some doubt had arisen as to whether or not the salesmen and peddlers of fresh milk and other dairy products were covered by the exemption granted to *traveling salesmen* traditionally established by the laws in regard to *extra hours*. (This refers to the payment of *extra hours* and the working day of Act No. 379 of 1948.) That it was desirable in order not to detain the continuous development and expansion of the dairy industry *to clarify, definitively,* any doubt there could be as to the applicability of the laws and decrees concerning *extra hours* to these peddlers and their helpers. It also stated that the commission plan to pay the peddlers and their helpers had proved to be fair and reasonable and that said workers could be protected by the Minimum Wage Board by the fixing of minimum commissions based on the recommendations of the Committees appointed. 19, Part 4 Journal of Proceedings 1666.

(4) As a ground for the doubt, the Statement of Motives also indicated that the enterprises did not have direct control or the necessary supervision of the peddlers' work for the purpose of computing *extra hours*.

(5) The Bill having been submitted by the Labor Committee, the original Statement of Motives was drafted as it appears in Act No. 114, preserving the motives of the Bill already stated.

(6) The Bill was amended to include the matter contained in § 3 of the Act approved. There was nothing in the discussion of the Bill in the House to alter the original purpose of its presentation, which, as has been said, was to clarify, to dispel doubts, in the sense that the provisions of the law in force in relation to the *maximum working hours and extra hours* would not apply to said driver-peddlers.

(7) On the other hand, for the purpose of not leaving them unprotected as to leave of absence, day of rest, sick leave and other *working conditions guaranteed to other employees of those industries* not related to the *maximum working hours and extra hours*, § 3, not originally in the Bill, was included. 19, Part 4 Journal of Proceedings 1666, 1678–1686.[2]

There is nothing in Act No. 114 against the actions of the Committee and the Board. The law dispelled the doubts and fears of the dairy enterprises and proceeded to exclude the driver-salesmen of the guarantees offered by other legislation as to the *maximum working hours* and *extra hours*, like the traveling salesmen had been excluded from said provisions by Act No. 379 of 1948. The reason in both cases: the same—the enterprises' difficulty in exercising the necessary control and supervision of the work, as to maximum working hours and extra hours, because of the nature of the work.

Act No. 114 did not deprive the Committee or the Board

---

[2] There was ample discussion in the House motivated by certain amendment by the Labor Committee which established a difference between the union workers and the non-union workers of the Dairy Industry. The amendment was defeated. Journal of Proceedings, *id.*

of the authority expressly granted to both to fix a minimum wage rate alternatively. The Committee and the Board were aware, on the basis of the evidence before them, that situations could arise in which a wage fixed only on the basis of a commission could be destructive of the worker's right to a minimum wage; this was one of said situations in which, according to the legislative expression in Act No. 96 it was deemed advisable and desirable to fix the wage alternatively. Factors not under the control of the employee, like the breaking down of the vehicles, unforeseen events, could deprive the worker of pay, even when he had been working, solely on the unit basis. The Decree only fixes a minimum wage rate irrespective of any contingency for which the worker is not responsible.

With this determination of the Committee and the Board we do not find it lawful for us to intervene without violating the provision of law governing the judicial review of the Mandatory Decrees. On the other hand, the Decree challenged does not ignore Act No. 114, since it fixes minimum wages for said workers on the basis of unit or commission.

Section 1 of Act No. 96 provides that it is the policy of the Legislature of Puerto Rico that the proceedings authorized by this act for *the fixing* and *revision* of minimum wages be conducted in a quasi-legislative manner. Although not stated therein, a Mandatory Decree is a legislative provision, a regulation of positive law which arises from the weighing of a situation of fact which has been under the consideration of the Committee.

To render effective said public policy, the Legislature itself carefully outlined the ambit of the judicial review of a Decree and determined: (Section 29)

1. The findings of fact at which a Minimum Wage Committee, acting within its powers, may arrive, *shall*, in the absence of fraud, *be conclusive.*

The conclusion of the Committee as to the existence of a situation of fact which made it advisable, under § 16 of Act No. 96, amended by Act No. 105 of 1964, to fix a wage rate alternatively, should be conclusive for the court.

2. The court may affirm, annul or remand a Decree, but the *annulment* or *remand* of a Decree shall be only:

(a) because the Committee acted without authority or ultravires, provided said question has been expressly raised before the Committee and later before the Board, or before the latter;

(b) because the Board acted without authority or ultravires, if the question was expressly raised before the Board;

(c) because the decree was procured through fraud.

None of the facts previously stated, which authorize this Court to *annul* a Decree, occurred in the case at bar. After the approval of Mandatory Decree No. 27, which is challenged, Act No. 114 was approved. The Board understood that it should not remand the Decree to the Committee considering that the Decree and Act No. 114 subsequently approved were not incompatible. The Board was right, because they are not incompatible, and Act No. 114 did not *refer to minimum wages*, but *minimum working days* and working conditions. At no time whatsoever did Act No. 114 deprive the Committee and the Board of the power to fix a wage rate alternatively, expressly granted by Act No. 96.

But even if the determination of the Board in refusing to remand the Decree were debatable and would admit opposition, in the absence of plain illegality it should carry great weight with the Court under well-established rules of judicial review of the administrative and quasi-legislative acts; and in deference to the administrative body designated by law as the one specially empowered to make such determinations of minimum wages and in compliance with the legislative public policy which expressly fixed the limitations of this Court in the judicial review of a Decree.

Contrary to the foregoing, the new majority opinion sub-

810

stitutes the view and the administrative interpretation of Act No. 114 made by the Board for the view and interpretation suggested by the enterprises, which the Court adopts, without apparent reasons of weight compelling such action except a difference of opinion as to the scope of the statute. The Decree being a piece of legislation, and if Act No. 114 were subject to two different interpretations, one annulling the Decree and the other reconciling it, I deem it our duty to choose the second, as the Board did.

In organizing the Minimum Wage Committee an excellent, intelligent, and democratic body was created. Three of its members represent the employers' interest, three the workers' interest, and three represent the public interest who serve as stabilizing agent between the two other parties. The product of the Committee, which is the Decree, is fundamentally well-balanced, fair, reasonable, and equitable for all the interests involved. Hence, the Legislature provided that the findings *of fact* of the Committee, in the absence of fraud, be untouchable, even by the Board. The court would not be better qualified than the Committee for weighing the findings of fact of the latter, but even if it were, the legislative order was not to alter them.[3]

Finally in view of the problem involved herein, the fact of the economic situation of the dairy enterprise to which marked emphasis is given in the opinion on reconsideration is unsubstantial.

The purpose of Act No. 114, which appears from its face, was not to meet or remedy the commercial situation of the dairy enterprises. To meet that problem, the Legislature has been approving a set of laws and appropriate

---

[3] In his separate opinion in the case of *People* v. *Santos Cornier*, decided April 2, 1969, Mr. Justice Rigau stated that "this Court should exercise its power to reverse on the facts with a great sense of self-discipline." In the circumstances under which by law this Court is permitted to review a Decree, said call to self-discipline attains its most profound meaning.

measures. *See:* a recital of these laws and aid measures in my majority opinion in *Industria Lechera* v. *Sec. of the Treasury,* 95 P.R.R. 819 (1968). The fact that Mandatory Decree No. 27, Third Revision of 1965, has been in full force and effect has not brought the downfall of the dairy enterprises, judging from the fact that Mandatory Decree No. 27, Fourth Revision of 1968 was adopted by the Committee in the same alternative manner as the fixing of minimum wages for said employees. As a question of reality, the Industry as a whole did not always function on the unit basis.

For the reasons stated above I dissent as to the annulment of Mandatory Decree No. 27, Third Revision, 1965, now on reconsideration.